**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**DANIEL G. PAPPAS**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**CHERRIE L. B. WELLS**
INDIANA DEPT OF CHILD SERVICES
Fort Wayne, Indiana

**ROBERT J. HENKE**
DCS CENTRAL ADMINISTRATION
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

FILED

Oct 31 2012, 9:38 am

CLERK
of the supreme court,
court of appeals and
tax court

| | | |
|---|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of A.A.M., minor child, and B.J., mother: | ) ) ) ) | |
| B.J. (Mother), | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 02A03-1201-JT-42 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT, JUVENILE DIVISION
The Honorable Charles F. Pratt, Judge
Cause Nos. 02D08-1105-JT-81

**October 31, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

B.J. ("Mother") appeals the involuntary termination of her parental rights to her child, A.M. In so doing, Mother challenges the sufficiency of the evidence supporting the trial court's judgment.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of A.M., born in September 1998.[1] The facts most favorable to the trial court's judgment reveal that in December 2009 the local Allen County office of the Indiana Department of Child Services ("ACDCS") received and substantiated a referral for neglect and lack of supervision involving Mother and A.M. The referral specifically alleged that Mother, who has a history of substance abuse and prior involvement with ACDCS,[2] was unemployed and again using illegal substances. Later the same month, Mother tested positive for cocaine and was observed by an ACDCS case worker as appearing to be "under the influence of an illegal drug" and "not coherent" during a subsequent home visit. *State's Ex*. 6 at 1.

ACDCS was initially unable to locate A.M. because Mother refused to disclose the child's whereabouts. Mother later admitted, however, that she had placed A.M. with Mother's cousin several months earlier, and the trial court entered an order that allowed

---

[1] Paternity of A.M. has not been established. The parental rights of A.M.'s alleged biological father, An.M. ("Father"), were terminated by the trial court in its January 2012 termination order. Father does not participate in this appeal. Consequently, we limit our recitation of the facts to those facts pertinent solely to Mother's appeal.

[2] A.M. was previously determined to be a CHINS in 2000.

2

A.M. to remain in relative placement with the maternal cousin.[3] The trial court thereafter adjudicated A.M. to be a CHINS in April 2010.

Following a dispositional hearing in June 2010, the trial court issued an order formally removing A.M. from Mother's care and custody and making the child a ward of ACDCS. The trial court's dispositional order further directed Mother to participate in and successfully complete a variety of tasks and services designed to address her parenting deficiencies and to facilitate reunification with A.M. Among other things, Mother was ordered to: (1) refrain from all criminal activities and the use of alcohol, illegal drugs, and other substances; (2) submit to random drug screens; (3) participate in a drug and alcohol evaluation and any resulting treatment recommendations; (4) maintain clean, safe, and appropriate housing at all times; (5) obtain a psychological assessment and follow all recommendations; (6) take all medications as prescribed; and (7) cooperate with all caseworkers, the Guardian ad Litem ("GAL") and the court-appointed special advocate ("CASA") and accept all announced and unannounced home visits.

Mother's participation in court-ordered services was sporadic from the beginning and ultimately unsuccessful. She repeatedly denied ACDCS caseworkers access to her home and refused to maintain consistent contact with service providers. After failing to appear for multiple re-scheduled appointments for a substance abuse evaluation, Mother eventually completed the assessment in September 2010 and was referred for treatment. Mother failed to complete the recommended treatment program, however, even after a

---

[3] A.M. was later removed from relative care and placed in foster care in March 2010 after the maternal cousin failed a criminal background check.

3

second referral. Additionally, Mother continued to test positive for cocaine in June and December 2010, January 2011, and twice in April 2011. Mother also tested positive for opiates in January, February, and December of 2010, as well as in April 2011. As for Mother's mental health issues, Mother refused to participate in individual counseling notwithstanding her diagnosis of bipolar disorder and depression. Mother also refused to take her medication as prescribed. Finally, although Mother participated in supervised visitation, her visitation privileges were suspended three times for failing to appear for scheduled visits, and she never progressed to unsupervised visits.

Based on Mother's non-compliance and lack of progress in services, ACDCS filed a petition seeking the involuntary termination of Mother's parental rights to A.M. in May 2011. A three-day evidentiary hearing on the termination petition was subsequently held in September and October 2011. During the termination hearing, ACDCS presented substantial evidence concerning Mother's failure to successfully complete and/or benefit from a majority of court-ordered reunification services available throughout the underlying CHINS and termination cases. In addition, ACDCS established that Mother was currently unemployed and without independent housing, continued to struggle with her addiction to cocaine and unresolved mental health issues, and remained incapable of providing A.M. with a safe and stable home environment.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On January 3, 2012, the court entered its judgment terminating Mother's parental rights to A.M. Mother now appeals.

## DISCUSSION AND DECISION

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Mother's parental rights, the trial court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*,

5

666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *K.S.*, 750 N.E.2d at 836.

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

(B)  that one (1) of the following is true:

(i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)  The child has, on two (2) separate occasions, been adjudicated a child in need of services; [and]

(C)  that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2).[4]   The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in Indiana Code section 31-35-

---

[4] We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

2-4 are true, the court *shall* terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a).  Mother challenges the sufficiency of the evidence supporting the trial court's findings as to subsections (b)(2)(B) and (C) of the termination statute cited above.

## I. Conditions Remedied/Threat to Well-Being

Indiana Code section 31-35-2-4(b)(2)(B) requires the trial court to find that only one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence before terminating parental rights.  Here, the trial court determined that ACDCS established, by clear and convincing evidence, subsections (b)(2)(B)(i) and (ii) of the termination statute.  Because we find it to be dispositive under the facts of this case, we shall consider only the former requirement, namely, whether ACDCS sufficiently established that there is a reasonable probability the conditions resulting in A.M.'s removal or continued placement outside of Mother's care will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

When making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions.  *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*.  The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child."  *Id.*  Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.  *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*.  The trial court may also

7

consider any services offered to the parent by the county department of child services and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Moreover, ACDCS was not required to provide evidence ruling out all possibilities of change; rather, it needed to establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Mother asserts on appeal that ACDCS failed to establish, by clear and convincing evidence, that the conditions resulting in A.M.'s removal would likely not be remedied because Mother had already "complied with many of the requirements of her parent participation plan at the time of the termination trial." *Appellant's Br*. at 4. Mother goes on to assert that whether or not the trial court considered Mother's testimony at all remains "unknown" in light of the trial court's specific finding that Mother failed to appear at trial when, in fact, she attended the second day of the termination hearing and even testified. *Id.* Mother therefore contends that the trial court's "clearly erroneous finding . . . requires that the termination of her parental rights be overturned." *Id.* at 4.

In terminating Mother's parental rights, the trial court made extensive findings regarding Mother's unresolved substance abuse and mental health issues, parenting deficiencies, and lack of stability. Specifically, the court found that Mother had "failed to complete" the recommended drug treatment program, continued to test positive for cocaine and opiates throughout the underlying proceedings, "failed to participate" in individual counseling, and "admitted to the caseworker that she had not taken her

8

medications as prescribed." *Appellant's App*. at 12. Based on these and other findings, the trial court concluded:

> By clear and convincing evidence[,] the Court determines that there is a reasonable probability that [the] reasons that brought about the child's placement outside the home will not be remedied. The Respondent Mother [has] not completed her addictions counseling. She has not taken her medications as prescribed. She has continued to test positive for controlled or illegal substances . . . [and] the reasons for the child's removal continued to exist in [Mother's] behaviors.

*Id.* at 13-14. Our review of the record leaves us convinced that clear and convincing evidence supports the trial court's findings cited above.

Although the evidence confirms Mother participated in a few of the recommended services, including a substance abuse evaluation and psychological assessment, she refused to follow through with the ensuing treatment recommendations. For example, during the termination hearing, ACDCS case manager Faith Jackson ("Jackson") confirmed that Mother attended only three of the recommended substance abuse "group [counseling] sessions," "never" provided ACDCS with confirmation that she had ever attended the recommended Alcohol Anonymous and Narcotics Anonymous classes, and continued to test positive for illegal substances throughout the underlying proceedings. *Tr.* at 59. Jackson also informed the trial court that Mother refused to submit to the recommended psychiatric evaluation and individual counseling following the psychological assessment, failed to maintain consistent contact with ACDCS, and denied case workers access to her home "maybe six (6) or seven (7) times." *Id.* at 58. Similarly, Licensed Addictions Counselor and Executive Director of Caring About People, Inc.,

9

Kimbra O'Brien ("O'Brien") testified that Mother attended only three two-hour sessions of the recommended "forty (40) hours in substance abuse treatment." *Id.* at 228.

The evidence further establishes that Mother failed to achieve any significant, long-term improvement in her ability to parent A.M. despite a wealth of services available to her for nearly two years. When asked what was her "greatest concern" should the trial court not grant ACDCS's petition for termination of Mother's parental rights, Jackson answered, "Reunification." *Id.* at 93-94. Jackson went on to explain that Mother continues to struggle with her "long-lasting addiction to cocaine," was recently evicted from her home and had not secured alternative housing, remained involved with a boyfriend who was "currently incarcerated for domestic violence against [Mother]," and therefore Mother was "not in a stable environment right now to care for [A.M.]." *Id.* at 94, 178. CASA Rex McFarren ("McFarren") likewise informed the trial court that he recommended termination of Mother's parental rights to A.M. for the following reasons:

> Unfortunately, we have a mother here who is responsible for a thirteen (13) year old child who came into the system because of [the mother's] drug use. [Mother's] been ordered . . . to cease and desist [from] the use of drugs, and she continues to test positive for drugs. At the last court hearing, there was testimony that [Mother] had received an eviction notice, and so we're unsure [if] she has even a residence at this point in time for her child. This case came in in January of 2010, so we are now about twenty (20) months, twenty-one (21) months into this case, and we are no closer to having this child placed back with her mother than we were twenty (20) months ago. . . .

*Id.* at 242.

As noted above, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's

10

*habitual patterns of conduct* to determine the probability of future neglect or deprivation of the child. *D.D.*, 804 N.E.2d at 266. Where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Here, the record makes clear that throughout the underlying proceedings Mother demonstrated a persistent unwillingness and/or inability to take the actions necessary to show that she is capable of overcoming her addiction to cocaine and other substances and of providing A.M. with the safe, stable, and drug-free home environment the child needs to thrive. Based on the foregoing, we conclude that the trial court's determination that there is a reasonable probability the conditions resulting in A.M.'s removal from Mother's care will not be remedied is supported by clear and convincing evidence.

In arriving at our decision today, we acknowledge Mother's assertion that the trial court erroneously found that Mother failed to appear for each day of the three-day termination hearing. The record confirms, and the State concedes on appeal, that although Mother failed to show on the first and last hearing dates, she did appear mid-way through the hearing on the second day of evidence and testified on her own behalf. Contrary to Mother's assertions, however, the trial court's erroneous finding does not mandate reversal because the judgment remains sufficiently supported by numerous other findings which substantiate its determination that there is a reasonable probability that the reasons for removal and continued placement of A.M. outside Mother's care will not be remedied. *See, e.g., A.J. v. Marion Cnty. Office of Family & Children*, 881 N.E.2d 706, 715 (Ind. Ct. App. 2008) (to extent a judgment is based on erroneous findings, those

findings are superfluous and are not fatal to judgment if remaining valid findings and conclusions support judgment), *trans. denied.* Moreover, the trial court was not obliged to give the same weight to Mother's self-serving statements as she did, including Mother's unsupported testimony that she successfully complied with all of the trial court's dispositional orders, never used illegal substances during the underlying proceedings, and believed the positive drug screen reports were "the fault of the lab." *Tr.* at 216; *see also D.D.*, 804 N.E.2d at 267 (trial court was permitted to judge parents' credibility and weigh their testimony against significant testimony demonstrating Mother's habitual conduct in failing to address her mental health and addiction issues and of providing safe and stable home environment). We therefore conclude that Mother's arguments amount to an impermissible invitation to reweigh the evidence. *Id*. at 265.

## II. Best Interests

We next consider Mother's assertion that ACDCS failed to prove termination of her parental rights is in A.M.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Moreover, we have previously held that the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be

12

remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re M.M.*, 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

In addition to the findings previously cited, the trial court made several additional pertinent findings relating to A.M.'s best interests. Specifically, the trial court noted Therapist Vanessa Hogan's ("Hogan") testimony that A.M. "suffers from loss and separation issues," that the child "needs stability" to help achieve her "educational goals," and that A.M. indicated she would "be sad" if not allowed to see her mother but also "understood" that Mother is not able to consistently provide for her needs. *Appellant's App.* at 13. The court's findings also acknowledged Mother's failure to comply with court-ordered reunification services, ongoing positive drug screens, and refusal to participate in counseling. Based on these and other findings, the trial court concluded that termination of Mother's parental rights is in A.M.'s best interests, noting CASA McFarren's testimony recommending termination, as well as A.M.'s need for permanency and the negative impact Mother's ongoing drug use has had on A.M.'s "mental wellbeing." *Id.* at 14. These findings and conclusions, too, are supported by the evidence.

During the termination hearing, Hogan informed the trial court that A.M. needed to live in a home environment that was filled with "love," "consistency," and "stability" in order to "grow in a healthy manner and [to] be a successful child and move . . . successfully into adulthood." *Tr.* at 46. Similarly, in recommending termination of Mother's parental rights, CASA McFarren testified:

[A.M.] deserves permanency[.] [S]he deserves one (1) home to grow up in that's drug free. She deserves an adult to be responsible for her and for [A.M.] not to be responsible for an adult. Neither [Father] nor [Mother] have indicated -- their behavior [has not] indicated any seriousness about trying to provide that for [A.M.]. . . .

*Id.* at 242.

Based on the totality of the evidence, including Mother's ongoing struggle with substance abuse, unresolved mental health issues, and failure to successfully complete and/or benefit from a wealth of reunification services available to her, coupled with the testimony from the ACDCS case manager, A.M.'s therapist, and CASA McFarren recommending termination of the parent-child relationship, we conclude that there was sufficient evidence to support the trial court's determination that termination of Mother's parental rights is in A.M.'s best interests. *See*, *e.g.*, *In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (testimony of court-appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), *trans. denied*.

This court will reverse a termination of parental rights "'only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made.'" *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (*quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

NAJAM, J., and MAY, J., concur.